UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JASON HUGHES, et al.,

    Plaintiffs,

    v.

MCDONALD'S CORP., et al.,

    Defendants.

_____/

No. C 14-1700 PJH

**ORDER GRANTING MOTION TO REMAND**

On July 2, 2014, plaintiffs' motion to remand came on for hearing before this court. Plaintiffs Jason Hughes and Ryan Schuetz ("plaintiffs") appeared by their counsel, Matthew J. Murray. Defendants McDonald's Corp., McDonald's U.S.A., LLC, and McDonald's Restaurants of California Inc., appeared by their counsel, Fred Alvarez. Defendant Fremak Arches, Inc., appeared by its counsel, Fraser A. McAlpine.[1]  Having carefully reviewed the parties' papers and considered the arguments of counsel and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiffs' motion to remand as follows.

**BACKGROUND**

On March 12, 2014, plaintiffs filed a class action complaint in state court alleging: (1) failure to pay all wages when due; (2) failure to pay overtime wages; (3) failure to pay minimum wages; (4) failure to provide required meal periods or pay missed meal period wages; (5) failure to provide required rest breaks or pay missed rest break wages; (6)

---

[1] The McDonald's corporate defendants and defendant Fremak filed separate opposition briefs to plaintiffs' motion, however, both groups of defendants will be referred to collectively as "defendants" in this order.

failure to pay all wages due to discharged and quitting employees; (7) failure to maintain required records; (8) failure to furnish accurate itemized wage statements; (9) negligence; (10) private attorney general act ("PAGA") penalties; and (11) unfair and unlawful business practices in violation of California Business & Professions Code §17200 et. seq.

On April 11, 2014, Fremak filed a notice of removal under the Class Action Fairness Act ("CAFA") and had the case removed to this court.

On May 28, 2014, plaintiffs filed the present motion to remand the case back to state court. The parties do not dispute that CAFA's minimal diversity and minimal class size requirements are met. Plaintiffs seek remand solely on the basis that defendants have failed to make a sufficient showing that the amount in controversy satisfies the $5,000,000 minimum required by CAFA for federal jurisdiction.[2]

**DISCUSSION**

A. Legal Standard

"[A]ny civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant . . . to the district court of the United States for the district and division embracing the place where such action is pending." Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 7–8 (1983) (citation omitted). See also 28 U.S.C. § 1441. However, federal courts are courts of limited jurisdiction. See, e.g., Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).

Accordingly, the burden of establishing federal jurisdiction for purposes of removal is on the party seeking removal, and the removal statute is construed strictly against removal jurisdiction. Valdez v. Allstate Ins. Co., 372 F.3d 1115, 1117 (9th Cir. 2004). See also Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992). "Federal jurisdiction must be

---

[2] In its opposition, Fremak requests a stay pending the Supreme Court's decision in Dart Cherokee Basin Operating Company, LLC v. Owens, et. al., on the question of whether a defendant seeking removal to federal court is required to include evidence supporting federal jurisdiction in the notice of removal. The case is not scheduled to be heard until October 2014, and the court denies Fremak's request to stay.

2

rejected if there is any doubt as to the right of removal in the first instance." Gaus, 980 F.2d at 566.

CAFA provides that district courts have original jurisdiction over any class action in which (1) the amount in controversy exceeds five million dollars, (2) any plaintiff class member is a citizen of a state different from any defendant, (3) the primary defendants are not states, state officials, or other government entities against whom the district court may be foreclosed from ordering relief, and (4) the number of plaintiffs in the class is at least 100. 28 U.S.C. §§ 1332(d)(2), (d)(5). Further, "under CAFA the burden of establishing removal jurisdiction remains, as before, on the proponent of federal jurisdiction." Abrego Abrego v. The Dow Chemical Co., 443 F.3d 676, 685 (9th Cir. 2006).

The Ninth Circuit has held that if it is "unclear or ambiguous from the face of a state-court complaint whether the requisite amount in controversy is pled," a "preponderance of the evidence" standard applies. Guglielmino v. McKee Foods, Inc., 506 F.3d 696, 699 (9th Cir. 2007) (citing Sanchez v. Monumental Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996)).

B.   Plaintiffs' Motion to Remand

As stated above, the parties' only dispute is whether defendants have shown, by a preponderance of the evidence, that the $5,000,000 amount in controversy is met. Defendants' amount in controversy estimate is $16,262,365.05, whereas plaintiffs argue that defendants' evidence supports, at the most, $3,730,935.01 in controversy.[3] The parties disagree over the inclusion of certain categories of damages.

1.   Future Damages

One of the parties' disagreements is whether future damages should be included in the total amount in controversy. Defendants include 2 years of future damages, based on

---

[3] Plaintiffs did not include any estimate of the amount in controversy in their opening motion, stating that they "will not speculate as to the amount in controversy." However, in an appendix attached to defendant Fremak's opposition brief, Fremak included detailed calculations showing how it reached its estimate. Plaintiffs, in their reply, challenged the inclusion of certain amounts, and thus reached their calculation of the amount in controversy.

3

the median time interval from the filing of a case through trial in this district.  Defendants thus calculate the amount in controversy by using 6 years of damages (4 years preceding the complaint, plus 2 years following the complaint), based on the complaint's allegation that "defendants have committed and continue to commit the violations."  See Complaint ¶ 226.

However, the court finds no basis for including such future damages in the amount in controversy calculation.  Courts in this district have rejected similar attempts, concluding that it is "not reasonable" for a defendant to assume that it will continue to violate the Labor Code "to the same degree even after the filing of the complaint."  See, e.g., Cifuentes v. Red Robin Int'l, Inc., 2012 WL 693930, at *5 (N.D. Cal. Mar. 1, 2012).  The Cifuentes court further noted that it "is unlikely that a defendant will continue to risk violating the law for six months after being put on notice by a lawsuit," and thus, the defendant "cannot rely on plaintiff's allegations that the class period encompasses this [future] period."  Id.; see also Commercial Casualty Ins. Co. v. Fowles, 154 F.2d 884, 886 (9th Cir. 1946) (holding that "no right to [] future benefits existed at the time the action was commenced," and thus, such future benefits cannot be included in the amount in controversy); Ajimatanrareje v. Metropolitan Life Ins. Co., 1999 WL 319216, at *2 (N.D. Cal. May 12, 1999) (following Fowles and rejecting inclusion of future damages because "amount in controversy must be determined as of the time removal is attempted").  While the court recognizes that each of these cases was decided at a time when the amount in controversy had to be established to a "legal certainty," the court finds that the inclusion of speculative future damages cannot meet even the lower "preponderance of the evidence" standard.

While defendants do identify cases where future damages were included in the amount in controversy calculation, the court finds those cases distinguishable, because in each case, the parties had a right to specific ongoing payments of amounts that were certain.  See Aetna Cas. & Sur. Co. v. Flowers, 330 U.S. 464, 467-68 (1947) (including anticipated payments in the amount in controversy because those "future payments [were]

not in any proper sense contingent"); Broglie v. MacKay-Smith, 541 F.2d 453, 455 (4th Cir. 1976) (including future damages because complaint "necessarily implied" that damages would "continue to mount until the time of trial.").

In this case, defendants' continued violations are not certain and thus, defendants are not unconditionally committed to paying plaintiffs during the litigation of this action.

Therefore, 2 years of future damages will be eliminated from each cause of action and will not be included in the calculation of the total amount in controversy. The court will go through the calculations contained in the appendix to Fremak's opposition brief (Dkt. 17, Appendix A) and will subtract any estimates based on anticipated future damages.

Those calculations include estimated damages for each claim under California's Labor Code (for failure to pay overtime, meal period violations, rest break violations, failure to pay wages due to discharged and quitting employees, and failure to furnish accurate itemized wage statements), and then separately include estimated penalties for claims arising under PAGA (which include penalties for failure to pay all wages due, maintain records, pay wages due on termination or resignation, pay money due twice a month, furnish accurate itemized wage statements, and meal period violations). Defendants categorize the Labor Code violation estimates as the "non-PAGA" total, and the court will start by deducting future damage estimates from this category.

a. Non-PAGA Future Damages

As to the second cause of action, failure to pay overtime, defendants' estimate of $59,852.52 for overtime violations includes 2 years of future damages in the amount of $19,950.84. Therefore, after eliminating those estimated futures damages, the amount in controversy for overtime damages is $39,901.68.

For the third cause of action, meal period violations, defendants' estimate of $1,420,719.30 includes 2 years of future damages in the amount of $473,573.10. Therefore, after eliminating those estimated future damages, the amount in controversy for meal period violations is $947,146.20.

5

For the fifth cause of action, rest break violations, defendants' estimate of $1,914,232.32 includes 2 years of future damages in the amount of $638,077.44. Therefore, after eliminating those estimated future damages, the amount in controversy for rest break violations is $1,276,154.88.

For the sixth cause of action, wages due to discharged and quitting employees, defendants' estimate of $935,258.94 includes 2 years of future damages in the amount of $352,016.28. Therefore, after eliminating those estimated future damages, the amount in controversy for wages due to discharged and quitting employees is $583,242.66.

For the eighth cause of action, failure to furnish accurate itemized wage statements, defendants' estimate of $1,460,700 includes 2 years of future damages in the amount of $983,400. Therefore, after eliminating those estimated future damages, the amount in controversy for failure to furnish accurate itemized wage statements is $477,300.

Thus, after eliminating only future damages estimated for California Labor Code claims (i.e., non-PAGA claims), the amount in controversy for non-PAGA claims stands at $3,323,745.42.

b.   PAGA Future Damages

For failure to pay all wages due, defendants' estimate of $3,338,268.96 in PAGA penalties includes 2 years of future penalties in the amount of $2,244,712.64. Therefore, after eliminating those estimated future penalties, the amount in controversy for failure to pay all wages due is $1,093,556.32.

For failure to maintain required records, defendants' estimate of $419,500 in PAGA penalties includes 2 years of future penalties in the amount of $102,000. Therefore, after eliminating those estimated future penalties, the amount in controversy for failure to maintain required records is $317,500.

For failure to pay wages due to discharged and quitting employees, defendants' estimate of $39,900 in PAGA penalties includes 2 years of future penalties in the amount of $20,400. Therefore, after eliminating those estimated future penalties, the amount in

controversy for failure to pay wages due to discharged and quitting employees is $19,500.

For failure to pay money due twice a month, defendants' estimate of $2,921,000 in PAGA penalties includes 2 years of future penalties in the amount of $1,966,400. Therefore, after eliminating those estimated future penalties, the amount in controversy for failure to pay money due twice a month is $954,600.

For failure to furnish accurate itemized wage statements, defendants' estimate of $148,500 in PAGA penalties includes 2 years of future penalties in the amount of $51,000. Therefore, after eliminating those estimated future penalties, the amount in controversy for failure to furnish accurate itemized wage statements is $97,500.

For failure to provide a meal period for a work period of more than five hours, defendants' estimate of $459,000 in PAGA penalties includes 2 years of future penalties in the amount of $325,200. Therefore, after eliminating those estimated future penalties, the amount in controversy for failure to provide a meal period for a work period of more than five hours is $133,800.

Thus, after eliminating only future estimates of PAGA penalties, the PAGA total stands at $2,616,456.32.

Thus, having eliminated future damages estimates from both the non-PAGA and PAGA calculations, the amount in controversy is reduced to $5,940,201.74 ($3,323,745.42 for non-PAGA claims, and $2,616,456.32 for PAGA penalties).

2. Other Assumptions Underlying Amount in Controversy Calculation

One of the other issues raised by plaintiffs' motion is whether defendants' assumed violation rates for each alleged violation are supported by the specific allegations of the complaint or the defendants' evidence. Specifically, plaintiffs point out that defendants often assume 100% violation rates for the asserted claims, without providing any basis for those assumptions. See Moreno v. Ignite Restaurant Group, 2014 WL 1154063 (N.D. Cal. Mar. 20, 2014) (noting that courts in this district "disavow the use of a 100% violation rate when calculating the amount in controversy absent evidentiary support"). However,

defendants' argue they are entitled to assume high violation rates by listing four pages of policies and practices, cited from plaintiffs' complaint, that allegedly "support a conclusion of a 100 percent violation rate." Dkt. 17 at 4-8 (citing allegations of "policies and practices" from plaintiffs' complaint).

This court in Andersen v. Schwan addressed the issue of estimated violation rates and ultimately found that such speculative estimations should not be accepted. 2013 WL 3989562 (N.D. Cal. Aug. 2, 2013). Specifically, the court found as follows:

> One of the major disagreements in the present case is whether [defendant] is entitled to base its calculations on the assumption that each member of the class will have experienced each of the types of violations listed in the complaint. [Defendant] argues that it can extrapolate [plaintiffs] claims to the putative class as a whole and assume a 100% violation rate because [plaintiff] alleges that his claims are "typical of the claims of all members of the class." However, [plaintiff] argues that "[t]his type of gambit has been attempted - and rejected - in the past." Dkt. 19 at 4-6 (citing Roth v. Comerica Bank, 799 F.Supp.2d 1107, 1119-1120 (C.D. Cal. 2010)).
>
> District courts in California have disagreed over whether defendants may assume certain variables, such as "average hours of overtime worked per week or the rate of wage statement violations," when calculating the amount in controversy. Roth, 799 F.Supp.2d at 1127. For example, compare Coleman v. Estes Express Lines, Inc., 730 F. Supp. 2d 1141, 1150 (C.D. Cal. 2010) ("Plaintiff included no limitation on the number of violations, and, taking the complaint as true, Defendants could properly calculate the amount in controversy based on a 100% violation rate") with Smith v. Brinker Int'l, Inc., 2010 WL 1838726 at *4 (N.D. Cal. May 5, 2010) ("Defendants have failed to provide any evidence relating to either plaintiff's actual earnings or number of hours worked, asking the court to assume that each plaintiff worked an additional 2.5 hours each day in order to reach the amount-in-controversy threshold").
>
> In Roth, the court surveyed the approaches taken by the different district courts and concluded that "cases allowing defendants to rely on unsupported assumptions of 100% violation rates 'improperly shift the burden to plaintiff to refute speculative assertions of jurisdiction and establish that there is no jurisdiction.'" Altamirano, 2013 WL 2950600 at *5 (citing Roth, 799 F.Supp.2d at 1129).
>
> Courts that have followed the Roth approach have evaluated the defendant's calculations, and the assumptions on which they are based, to determine whether they are reasonable in light of the allegations in the complaint or are unduly speculative. Id. at *6. See also Ruby v. State Farm Gen. Ins. Co., 2010 WL 3069333 (N.D. Cal. Aug. 4, 2010) (conducting claim-by-claim analysis of whether the defendant's assumptions were reasonable); Baillie v. Account Receivable Mgmt. of Fla., 2011 WL 566817 (N.D. Cal. Feb.14, 2011) (analyzing

8

> reasonableness of defendant's assumptions in light of allegations in complaint). Therefore, the court will go step by step through assumptions made in defendant's calculations to determine whether they are reasonable in light of the allegations in the complaint.

Id., at *3.

The court will, as it did in Andersen, "go step by step through assumptions made in defendants' calculations to determine whether they are reasonable in light of the allegations in the complaint." The analysis for each cause of action follows.

    a.    Non-PAGA Claims

        i.    Estimated Overtime Damages

As to the second cause of action, defendants make two assumptions regarding estimated overtime damages. First, defendants assume a 100% violation rate based on plaintiffs' allegations (in the complaint) that defendants "do not pay overtime" and "have a policy of altering recorded hours to eliminate hours." Second, defendants assume they denied five minutes of overtime pay to every class member during every shift of 7.5 hours.

First, defendants' assumption of a 100% violation rate is unsupported by the complaint and similar assumptions have been rejected by courts in the past. In Martinez v. Morgan Stanley, the defendants used the plaintiffs' allegations that she worked 12 hours per weekday and approximately 60 hours per week to assume that every associate worked four hours of overtime every day. 2010 WL 3123175, at *5 (S.D. Cal. Aug. 9, 2010). The court flatly rejected this assumption, stating that, "[a]lthough Plaintiff alleged that her claims are typical of the class as a whole and that class members consistently worked overtime, this does not provide a basis to assume that every class member worked any particular number of overtime hours, much less that he or she worked the same number of overtime hours every workday as Plaintiff did on an unspecified occasion." Id.

Similarly, in Roth, defendants assumed that each class member worked three to five hours of overtime a week because the plaintiff alleged "class member[s] regularly and/or consistently worked in excess of eight (8) hours in a day, in excess of twelve (12) hours in a day, and/or in excess of forty (40) hours in a week." Roth, 799 F.Supp.2d at 1124. The

court held that the plaintiff's allegations did not support the defendants' assumption and that, without additional supporting evidence from the defendants, "the court must conclude that defendants' calculation is speculative to the extent it relies on this assumption." Id.

The reasoning expounded in Martinez and Roth applies to the present case. Although plaintiffs allege that overtime violations were a "regular" occurrence, this is not a basis for assuming a 100% violation rate regarding payment of overtime.

Second, defendants' assumption of overtime violations for every shift of 7.5 hours is speculative. Overtime is owed only when class members worked more than 8 hours a day or 40 hours a week. Plaintiffs' complaint makes no reference to a failure to pay for overtime on shifts that were scheduled to last 7.5 hours, yet defendants base their calculation of overtime damages on that figure. Defendants' assumption that every class member worked 35 minutes beyond each scheduled shift is unduly speculative and is not reasonable in light of the allegations in the complaint.

The unsupported assumptions listed above make it impossible to calculate or even estimate the correct amount of overtime wages owed to the putative class. Therefore, the court cannot accept defendants' calculations as to the amount in controversy for overtime damages.

ii.  Meal Period Damages

Defendants' calculations for the third cause of action, meal break violations, are based upon some of the same assumptions as the overtime calculation. Defendants assume (1) a 100% meal period violation rate for every shift of 5.5 hours and (2) a 75% meal period violation rate for every other shift.

First, defendants' assumption of a 100% meal period violation rate for shifts of 5.5 hours is agreed on by both parties. Based on the agreed rate, the relevant amount in controversy is $478,558.08.

Second, defendants' assumed 75% meal period violation rate on every other shift (other than 5.5 hours mentioned above) is speculative. Defendants do not offer any

evidence of frequency of late, missed, or interrupted meal periods. Thus, defendants have failed to meet the preponderance of evidence burden.

Therefore, defendants have established $478,558.08 in controversy for meal period violations (based on a 100% meal break violation rate for shifts of 5.5 hours and the elimination of damages related to a 75% meal period violation rate).

### iii. Rest Break Damages

Defendants' calculations for the fifth cause of action, rest break violations, are based on a 100% violation rate on all shifts lasting more than 3.5 hours. Both parties agree to a 100% violation rate, based on plaintiffs' allegation that defendants required class members to remain in the store during all rest breaks. Therefore, having already removed future damages, defendants have established $1,276,154.88 in controversy for rest break violations.

### iv. Wages to Discharged and Quitting Employees

Defendants' calculations for the sixth cause of action, wages to discharged and quitting employees, are based on a 100% violation rate. Defendants identify no support in the complaint for this assumption of a 100% violation rate, nor have defendants submitted evidence showing why their assumption is justified.

The unsupported 100% violation rate makes it impossible to calculate or even estimate the correct amount of wages owed to the putative class. Therefore, the court cannot accept defendants' calculations ($583,242.66) as to the amount in controversy for wages to discharged and quitting employees.

### v. Failure to Furnish Itemized Wage Statements

Regarding defendants' calculations for the eighth cause of action, failure to furnish accurate itemized wage statements, plaintiffs only dispute the inclusion of future damages, which have already been removed from the court's tally. Thus, defendants establish a total of $477,300 for failure to furnish accurate itemized wage statements.

Thus, after eliminating the unsupported damage estimates above (and having

already eliminated estimated future damages), the total amount in controversy for non-PAGA claims is $2,232,012.96.

b. PAGA

Under PAGA, 75% of the civil penalties recovered by aggrieved employees are distributed to the Labor and Workforce Development Agency (LWDA), while the remaining 25% are distributed to the litigating employees. Cal. Labor Code § 2699(i). The Ninth Circuit has yet to rule on whether the total PAGA recovery, or only the 25% which is distributed to the aggrieved employees, should be considered in determining the amount in controversy.

District courts are split on the issue. Compare Pagel v. Dairy Farmers of Am., Inc., 2013 WL 6501707, at *2-3 (C.D. Cal. Dec. 11, 2013) ("the fact that 75% of any PAGA penalties recovered in this action would be paid to the LWDA, not to individual class members, does not remove those sums from the amount in controversy calculation"); Quintana v. Claire's Stores, 2013 WL 1736671, at *7 (N.D. Cal. Apr., 22, 2013) (finding "unpersuasive plaintiff's argument that only 25% of PAGA recovery should be counted toward the amount-in-controversy requirement"); with Hernandez v. Towne Park, Ltd., 2012 WL 2373372, at *16 (C.D. Cal. June 22, 2012) ("the court concludes that only 25% of the potential recovery on the representative action can be included in calculating the amount in controversy on the PAGA claim."); Lopez v. Source Interlink Companies, Inc., 2012 WL 1131543, at *3 (E.D. Cal. Mar. 29, 2012) ("The 75% awarded to the state is not considered to be an amount in controversy for jurisdictional purposes").

The court will first determine the total amount of PAGA penalties that are justified by the complaint and/or defendants' evidence, and then, if necessary, will resolve the issue raised by Pagel and the other cited cases.

i. Failure to Pay All Wages Due

For the failure to pay all wages due, plaintiffs challenge only the already-removed future damages. However, defendants' calculations of PAGA penalties also include 25% of

12

the amount withheld for meal period and rest break violations.  See Dkt. 17-2 at 4.  The reduction in the amount in controversy estimates for those two causes of action necessarily results in a decrease for the 25% penalty.  Applying that reduction results in a total estimated PAGA penalty of $1,064,269.56 for failure to pay all wages due.

### ii. Failure to Maintain Required Records

For the failure to maintain required records, plaintiffs challenge only the already-removed future damages, resulting in a total of $317,500.

### iii. Failure to Pay Wages to Discharged & Quitting Employees

For the failure to pay wages due to discharged and quitting employees, plaintiffs challenge only the already-removed future damages, resulting in a total of $19,500.

### iv. Failure to Pay Money Due Twice a Month

Here, plaintiffs challenge the inclusion of PAGA penalties for "failure to pay all money due and payable twice during each month" (under Cal. Labor Code § 204), in light of the fact that defendants have already included penalties for "failure to pay all wages due" under Cal. Labor Code § 210.

The remedy for violation of section 204 is found in section 210, which provides that "every person who fails to pay the wages of each employee as provided in Section 204 ... shall be subject to a civil penalty."  Cal. Labor Code § 210.  Section 204 "does not provide for the payment of any wages nor create any substantive right to wages," instead, "the only remedy for failure to comply with [section] 204" is found in section 210.  See Singer v. Becton, Dickinson and Co., 2008 WL 2899825 (S.D. Cal. July 25, 2008) (citing In re Moffett, 19 Cal.App.2d 7, 13 (1937) ("[S]ole purpose of [Labor Code section 204] ... is to require an employer of labor who comes within its terms to maintain two regular pay days each month.")).

Thus, the court cannot accept defendants' inclusion of PAGA penalties for section 204, because those penalties are duplicative of the penalties for failure to pay all wages due under section 210.

###### v. Failure to Furnish Accurate Itemized Wage Statements

For the failure to furnish accurate itemized wage statements, plaintiffs challenge only the already-removed future damages, resulting in a total of $97,500.

###### vi. Failure to Provide a Meal Period

For the failure to provide a meal period for a work period of more than 5 hours, plaintiffs challenge only the already-removed future damages, resulting in a total of $133,800.

Thus, after eliminating the amounts mentioned above, and having already eliminated future penalties, the total estimated PAGA penalties are $1,632,569.56. If the court were to add 25% of the estimated PAGA penalties to the non-PAGA amount in controversy of $2,232,012.96, the total would be $2,640,155.35. If the court were to add 100% of the estimated PAGA penalties to the non-PAGA amount in controversy, the total would be $3,864,582.52.

#### c. Attorneys' Fees

In addition to the causes of action listed in the complaint, defendants include estimated attorneys' fees in their amount in controversy calculation. Indeed, where the underlying law provides for the payment of attorneys' fees, the amount of fees is included in calculating the amount in controversy for CAFA jurisdiction. Guglielmino, 506 F.3d at 700 (citing Galt v. Scandinavia, 142 F.3d 1150, 1156 (9th Cir. 1998)). However, the only fees to be considered as part of the amount in controversy calculation "are those incurred as of the date of removal." Icard v. Ecolab, 2010 WL 2528968 (N.D. Cal. 2010); see also Conrad Assoc. v. Hartford Acc. & Indem. Co., 994 F.Supp. 1196, 1200 (N.D. Cal. 1998) (estimation of attorneys' fees for inclusion in amount in controversy cannot be speculative and is based on time of removal); Faulkner v. Astro–Med, Inc., 1999 WL 820198, at *4 (N.D. Cal. 1999) ("the only fees that can be considered are those incurred as of the date of removal").

Having reduced the amount in controversy to remove future damages and to remove calculations based on unsupported assumptions, the amount in controversy stands at

either $3,864,582.52 (if 100% of PAGA penalties are included) or at $2,640,155.35 (if 25% of PAGA penalties are included). Because this case was removed only one month after it was filed, it is not reasonable to assume that any attorneys' fees incurred before removal would raise the amount in controversy (under either view of the PAGA issue) to the required $5,000,000 threshold. Thus, the court need not, and does not, resolve the issue of whether the amount in controversy should include 25% or 100% of PAGA penalties in the amount in controversy calculation.

## CONCLUSION

Therefore, defendants have failed to meet their burden of proving, by a preponderance of the evidence, that the $5,000,000 amount in controversy is satisfied. Thus, plaintiffs' motion to remand is GRANTED.

The Clerk shall **REMAND** this case to the Alameda County Superior Court.

**IT IS SO ORDERED.**

Dated: July 31, 2014

PHYLLIS J. HAMILTON
United States District Judge